UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ANN DIEFFENBACHER-KRALL<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNIVERSITY OF MAINE AND<br>THE UNIVERSITY OF MAINE SYSTEM<br><br>    Defendants. | Civil Action No. |

COMPLAINT
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Ann Dieffenbacher-Krall, Ph.D. ("Plaintiff" or "Dr. Dieffenbacher-Krall"), by and through undersigned counsel, and complains against the Defendants, The University of Maine and the University of Maine System ("Defendants") as follows:

INTRODUCTION

1. This action arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*; the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); the Maine Equal Pay law, 26 M.R.S. §§ 626-A and 628; and the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*

PARTIES

2. Dr. Dieffenbacher-Krall is a United States citizen residing in Old Town, Maine.

3. Defendant University of Maine is a Maine entity with operations in Penobscot County.

4. Defendant University of Maine System is a Maine entity with operations throughout the state of Maine including operations in Penobscot and Kennebec Counties.

1

## JURISDICTION

5. Each of the Defendants had 20 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged violations occurred.

6. This Court has jurisdiction over Dr. Dieffenbacher-Krall's federal claims pursuant to 28 U.S.C. § 1331.

7. This Court has jurisdiction over Dr. Dieffenbacher-Krall's state claims pursuant to 28 U.S.C. § 1367 and the Defendants' express consent to the Court's jurisdiction over the state law claims for purposes of this case.

8. On July 8, 2019, Dr. Dieffenbacher-Krall filed a timely Complaint / Charge of Discrimination against Defendants alleging unlawful sex discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

9. On or about February 26, 2020 the MHRC issued a Notice of Right to Sue with respect to Dr. Dieffenbacher-Krall's state law claims.

10. On or about June 11, 2020, the EEOC issued a Notice of Right to Sue with respect to Dr. Dieffenbacher-Krall's federal law claims.

11. Dr. Dieffenbacher-Krall has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

12. Defendant University of Maine System is Maine's largest educational enterprise. UMS is made up of seven universities including Defendant University of Maine located in Orono.

13. The College of National Sciences, Forestry, and Agriculture ("NSFA") is one of the major academic areas within the University of Maine.

14. The School of Biology and Ecology ("SBE") and the School of Marine Sciences ("SMS") are Schools within that College.

### FACTUAL ALLEGATIONS FOR MAINE EQUAL PAY LAW AND FEDERAL EQUAL PAY LAW VIOLATIONS

15. Dr. Dieffenbacher-Krall is a female administrator and teacher who has been employed by Defendants since 1998.

16. Dr. E[1] is a male administrator and teacher who has been employed by Defendants since 2000.

17. Dr. Dieffenbacher-Krall's current job title is Assistant Director in the SBE and her pay is $68,289 per year.

18. Dr. E's current job title is Associate Director in the SMS and his pay is $97,917 per year.

19. While employed by Defendants, Dr. Dieffenbacher-Krall has been paid substantially less than Dr. E.

20. The positions held by Dr. Dieffenbacher-Krall and Dr. E are unique as they are the only two professional (non-faculty) assistant/associate director positions of academic units in the College of NSFA.

21. The positions held by Dr. Dieffenbacher-Krall and Dr. E are the only assistant/associate director positions of academic units that are paid exclusively for their work in administration according to a list of all administrative positions created by the Dean's Office and handed out at the Executive Committee Retreat of August 20, 2019.

22. There are no other possible comparators.

---

[1] The Complaint uses the pseudonym "Dr. E" to protect the privacy of the employee in question.

3

23. During the period that Dr. Dieffenbacher-Krall's job was created and filled, the Defendants made repeated references to the job being "just like Dr. E's job". For example, during Dr. Dieffenbacher-Krall's interviews for the position she was told that the job would evolve to be "just like Dr. E's".

24. During the period that Dr. Dieffenbacher-Krall's job was created and filled she was also told that the position would encompass the undergraduate coordinate role and the responsibilities of the retiring assistant and associate directors in the SBE.

25. The Request to Fill paperwork associated with the position when it was created in 2011 reflected that the position was intended to encompass the undergraduate coordinator role and the responsibilities of the retiring faculty assistant and associate directors.

26. Ed Ashworth, the Dean at the time that the position was filled in 2011, agreed with the plan that the position would evolve to become identical to Dr. E's position and signed off on the request to fill paperwork.

27. The positions held by Dr. Dieffenbacher-Krall and Dr. E are the same in most respects.

28. During a conversation with Associate Dean George Criner and Assistant Dean Peter Reid regarding the title of undergraduate program coordinator, they joked to Dr. Dieffenbacher-Krall that "You're like a female [Dr. E]. You'll have to start wearing boots and flannel shirts" (referring to Dr. E's common attire).

29. Dr. Dieffenbacher-Krall and Dr. E's duties include serving as the Undergraduate Coordinator for the unit. This responsibility includes onboarding incoming first-year students and setting up their course schedules, advising transfer students and students with extra challenges, serving as back-up advisor for other advisors in the respective school, and advising

faculty advisors; creating the schedule of courses each semester; serving as chair of the school's Curriculum Committee; serving on the College Curriculum Committee; assessing transfer credits and acceptable course substitutions or requirement waivers; certifying that students have met graduation requirements; and teaching first-year success seminars.

30. Dr. Dieffenbacher-Krall and Dr. E represent their unit at College and University meetings and functions, serving on the same or similar College and University committees.

31. Dr. Dieffenbacher-Krall and Dr. E supervise classified and professional level administrative staff in their schools, contribute to School reports, and compile data.

32. Dr. Dieffenbacher-Krall and Dr. E coordinate appointments of Graduate Teaching Assistants and Research Assistants.

33. Dr. Dieffenbacher-Krall and Dr. E's teaching loads are similar. Dr. E's classroom teaching is currently limited to the First-Year Success Course, NFA117, which Dr. Dieffenbacher-Krall also teaches.

34. Dr. Dieffenbacher-Krall spends 61% of her time on undergraduate responsibilities, which is considered part of a teaching workload.

35. Both serve as Undergraduate Program Coordinators, considered under past teaching load formulae as the equivalent of teaching a 3-credit course.

36. Both conduct a great deal of student advising, a teaching function.

37. While Dr. E maintains 120 primary advisees, Dr. Dieffenbacher-Krall maintains 65-114 depending on current needs. Nonetheless, Dr. Dieffenbacher-Krall had 2,523 advising contacts, including 555 in-person meetings with students in calendar year 2018. Considering SBE has around 500 students, it is a safe assumption that she is having an advisory influence on every one of them.

38. Dr. E sometimes advises independent study or internship-credit courses. Although Dr. Dieffenbacher-Krall is frequently asked to do so by students, she redirects these students to faculty because she would not be able to handle the number of requests should this floodgate be opened. She does, however, serve on Honors Thesis Committees upon request.

39. Dr. Dieffenbacher-Krall's advising responsibilities are the same as Dr. E's, although Dr. Dieffenbacher-Krall is responsible for twice as many students.

40. The experience brought to the positions by Dr. E and Dr. Dieffenbacher-Krall was similar and accorded with the needs specified by the search committee for each position.

41. Dr. Dieffenbacher-Krall and Dr. E both have distinguished teaching careers.

42. Dr. Dieffenbacher-Krall's job title is currently styled "Cooperating Professor" which is a courtesy title that appears to be unique to the University of Maine. Dr. E was a "Cooperating Professor" until 03/31/06. Dr. E's title subsequently changed to "Assistant Professor" because he had "no other departmental home unit from which to cooperate." The same was true of Dr. Dieffenbacher-Krall as of the time she resigned from the University of Maine Climate Change Institute CCI in 2014 as her position within the University evolved.

43. Both Dr. Dieffenbacher-Krall and Dr. E brought to their position credentials common among faculty, including PhD degrees, and experience in research, publications, and securing grant funding.

44. Both currently have the same faculty functions with respect to undergraduate programs and curriculum decisions, and are the only two individuals without regular faculty status (defined in NSFA bylaws as tenure-track or continuing contract, *i.e.*, Instructor or Lecturer) serving as Undergraduate Program Coordinators and on the NSFA Curriculum Committee.

45. At least since August 15, 2015, Dr. Dieffenbacher-Krall and Dr. E have performed comparable work on jobs that have comparable requirements relating to skill, effort and responsibility.

46. At least since August 15, 2015, Defendants have discriminated against Dr. Dieffenbacher-Krall on the basis of sex by paying her less than the rate paid to Dr. E.

47. The pattern of discriminatory pay is highlighted by the pay rates for Dr. Dieffenbacher-Krall and Dr. E as reflected in information published as "The University of Maine System Salaries of Regular Employees" as set out below:

Dr. Dieffenbacher-Krall

| Date of Report | per year | per week |
|---|---|---|
| 4/6/2015 | $47,516 | $914 |
| 4/12/2016 | $47,516 | $914 |
| 11/3/2016 | $48,466 | $932 |
| 4/12/2017 | $48,466 | $932 |
| 11/1/2017 | $49,436 | $951 |
| 4/3/2018 | $49,436 | $951 |
| 11/5/2018 | $66,300 | $1,275 |
| 4/23/2019 | $66,300 | $1,275 |

Dr. E

| Date of Report | per year | per week |
|---|---|---|
| 4/6/2015 | $89,582 | $1,723 |
| 4/12/2016 | $89,582 | $1,723 |
| 11/3/2016 | $91,373 | $1,757 |
| 4/12/2017 | $91,373 | $1,757 |
| 11/1/2017 | $93,201 | $1,792 |
| 4/3/2018 | $93,201 | $1,792 |
| 11/5/2018 | $95,065 | $1,828 |
| 4/23/2019 | $95,065 | $1,828 |

48. Through August 1, 2020 Dr. Dieffenbacher-Krall was been underpaid by $187,802.

49. Dr. Dieffenbacher-Krall continues to suffer discrimination in pay of $553 per week.

50. Dr. Dieffenbacher-Krall has notified Defendants of the pay discrimination set out above on multiple occasions and has asked that Defendants address the discrimination.

51. Defendants have, to date, failed to fully address the pay discrimination.

FACTUAL ALLEGATIONS PERTAINING TO TITLE VII AND MHRA DISCRIMINATION CLAIMS.

52. In late February 2017, Dr. Dieffenbacher-Krall worked with her director, Dr. Andrei Alyokhin, on a request to be reclassified and promoted from Assistant Director to Associate Director to align with Dr. E's title.

53. They prepared and submitted to Defendants a Position Description Questionnaire (PDQ) and updated job description on 03/01/17.

54. Several months later, Kelly Hoovler, Human Resources Partner, told Dr. Alyokhin that the PDQ and job description needed to be resubmitted.

55. In an email dated 08/24/17, Ms. Hoovler told Dr. Alyokhin that Human Resources was supporting his request to reclassify Dr. Dieffenbacher-Krall to Associate Director.

56. Dr. Dieffenbacher-Krall resubmitted the PDQ paperwork with a few changes to Dr. Alyokhin on 09/02/17 listing the position title as Associate Director and Undergraduate Coordinator.

57. The job description (unchanged from the 03/01/17 version) included a statement that the incumbent could be promoted from Assistant to Associate Director.

58. On 01/31/18, Dr. Dieffenbacher-Krall received a letter dated 01/16/18, signed by Chris Lindstrom, VP of Human Resources, denying her reclassification/promotion request.

8

59. It is difficult to parse the stated reason for denying Dr. Dieffenbacher-Krall a promotion from Mr. Lindstrom's letter.

60. In paragraph one, Mr. Lindstrom wrote, "The Dean's office agrees that a restructuring is warranted, but cannot accept the proposed position change."

61. In paragraph two, Mr. Lindstrom wrote that the paperwork submitted seemed to indicate that Dr. Dieffenbacher-Krall was suggesting that a new position be created when in fact, she was asking for a promotion or reclassification.

62. In paragraph three, Mr. Lindstrom acknowledged that Dr. Dieffenbacher-Krall's responsibilities had increased since 2012, which is true.

63. In paragraph four, Mr. Lindstrom wrote that the Dean was asking the SBE Interim Director, Dr. Christopher Cronan, to "immediately realign [Dr. Dieffenbacher-Krall's] responsibilities with [her] present job description as Assistant Director," which seems to suggest that he was taking away Dr. Dieffenbacher-Krall's job duties and responsibilities – a *de facto* demotion.

64. In paragraph five, Mr. Lindstrom indicated that the College's approach to "new administrative positions" needed to be based on "a comprehensive and forward-looking discussion about the needs of the academic unit and financial resources."

65. Given that Dr. Dieffenbacher-Krall and her director were not asking for a new administrative position, they were asking for a promotion/reclassification of an existing position, the reason given in paragraph five does not apply to Dr. Dieffenbacher-Krall.

66. Mr. Lindstrom provided no indication of what "restructuring" of Dr. Dieffenbacher-Krall's position, mentioned in paragraph one, was contemplated.

67. Advancement from "Assistant" to "Associate" is a standard promotional title change within the University setting.

68. Furthermore, at the time that Dr. Dieffenbacher-Krall's position was created, the request to fill documentation provided that funding for the position would come, in part, from the stipend and salary that would have been paid to the Associate Director position that was being subsumed within her position.

69. After Dr. Dieffenbacher-Krall filed her Charge of Discrimination with the MHRC, Defendants justified the denial of promotion as follows: (a) Dr. Dieffenbacher-Krall and Dr. E work in different schools, (b) Dr. Dieffenbacher-Krall and Dr. E have different employment histories, (c) Associate Director positions have historically been held by tenured faculty members, and (d) if Dean Servello had been the decision-maker at the time, he would not have promoted Dr. E to Associate Director.

70. The reasons given for denying the promotion to Dr. Dieffenbacher-Krall that was given to Dr. E are pretexts covering up a discriminatory purpose.

71. Regarding rationale (a), promotional decisions are not made at the level of the school; they are made at the level of the College and by Human Resources. Although Dr. Dieffenbacher-Krall and Dr. E work in different schools, the two schools are comparable and are both within the same College. The same Human Resources managers are consulted and make decisions about their employment status.

72. Regarding rationale (b), the fact that Dr. Dieffenbacher-Krall and Dr. E have different employment histories explains nothing. No two people are exactly the same. Dr. Dieffenbacher-Krall's employment history is stronger than Dr. E's in some respects. For example, she has been on the faculty of the Graduate School since 2000, five years longer than

Dr. E who did not join the faculty of the Graduate School until 2005. Dr. Dieffenbacher-Krall has stronger academic research credentials than Dr. E. She has more peer-reviewed publications. She has raised more than $1.4 million dollars in research grants during her career. Upon information and belief, Dr. E has been awarded some research grants but that is not reflected in his curriculum vitae.

73. Regarding rationale (c), it may be true that Associate Director positions are historically and even currently held by tenured faculty members. However, Dr. E (male) is not a tenured faculty member and he is an Associate Director. Dr. Dieffenbacher-Krall (female) performs job duties that are nearly identical to those of Dr. E and was denied the same prestigious job title.

74. Regarding rationale (d), it is irrelevant that Dean Servello may not have promoted Dr. E to Associate Director if he was the decision-maker at the time Dr. E was promoted. Dean Servello is the top administrator of the College where Dr. Dieffenbacher-Krall and Dr. E both work. Defendants must treat similarly situated male and female employees the same in the present.

75. Defendants are permitting Dr. E (male) to hold the job title of Associate Director while denying the same job title to Dr. Dieffenbacher-Krall (female) even though she performed job duties that are nearly identical to those of Dr. E.

76. The denial of Dr. Dieffenbacher-Krall's request for promotion was unwarranted, humiliating, and detrimental to her career.

77. Defendants acted intentionally and with deliberate indifference to Dr. Dieffenbacher-Krall's rights.

## COUNT I: Maine Equal Pay

78. Paragraphs 1-51 are incorporated by reference.

79. Defendants paid Plaintiff lower wages than Defendants paid male employees for comparable work on jobs that had comparable requirements relating to skill, effort and responsibility.

80. Defendants' conduct violated the Maine Equal Pay law.

## COUNT II: EPA

81. Paragraphs 1-51 are incorporated by reference.

82. Plaintiff was paid less than a male employee even though she performed equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

83. Defendants' conduct violated the EPA.

## COUNT III: Title VII

84. Paragraphs 1-83 are incorporated by reference.

85. Plaintiff is female.

86. Plaintiff was qualified for the position she held with Defendants.

87. Plaintiff has been discriminated against in the terms and conditions of employment because of sex.

88. Plaintiff has been discriminated against in pay and in regard to her job title because of sex.

89. Plaintiff's sex is a motivating factor in the disparate treatment of her relative to her male counterpart.

90. Defendants' conduct violated Title VII.

## COUNT IV: MHRA

91. Paragraphs 1-90 are incorporated by reference.

92. Plaintiff is female.

93. Plaintiff was qualified for the position she held with Defendants.

94. Plaintiff has been discriminated against in the terms and conditions of employment because of sex.

95. Plaintiff has been discriminated against in pay and in regard to her job title because of sex.

96. Defendants' conduct violates the MHRA.

## REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

(a) Declare the conduct engaged in by Defendants to be in violation of her rights;

(b) Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate her rights;

(c) Order Defendants to align Plaintiff's job title with her male counterpart;

(d) Order Defendants to increase Plaintiff's pay to align with her male counterpart;

(d) Order Defendants to pay Plaintiff the difference between what she was actually paid and the pay of her male counterpart during the same timeframe;

(e) Award equitable-relief for back pay, benefits and prejudgment interest;

(f) Award compensatory damages in an amount to be determined at trial;

(g) Award punitive damages in an amount to be determined at trial;

(h) Award liquidated (treble) damages;

(i) Award nominal damages;

(j) Award attorney's fees, including legal expenses, and costs;

(k) Award prejudgment interest;

(l) Permanently enjoin Defendants from engaging in any employment practices which discriminate on the basis of sex;

(m) Require Defendants to mail a letter to all employees notifying them of the judgment against them and stating that Defendants will not tolerate discrimination in the future;

(n) Require that Defendants post a notice in all of its workplaces of the judgment and a copy of the Court's order for injunctive relief;

(o) Require that Defendants train all management level employees on the protections afforded by the MHRA, Title VII, EPA and Maine Equal Pay law;

(p) Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants paid her unfairly due to sex; and

(q) Grant to Plaintiff such other and further relief as may be just and proper.

Dated: July 30, 2020

/s/ Chad T. Hansen
Chad T. Hansen
Attorney for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
chad@employeerightslaw.attorney